Law Offices of

# SHELDON KARASIK, P.C.

A Professional Corporation

175 East 96th Street
Suite 9L
New York, New York 10128
Direct Dial: (212) 722-0694
Cell: (917) 587-8153
sklawfirm@yahoo.com

**Sheldon Karasik**
**Member of New York Bar**

March 5, 2014

**VIA ECF**

The Honorable William D. Wall
Magistrate Judge
United States District Court
Eastern District of New York
944 Federal Plaza
Central Islip, New York 11722

RE:   *Spector Group II, LLP v. Transportation Insurance Company, et al.*
      United States District Court for the Eastern District of New York
      Case No. 2:12-cv-3081-LDW-WDW

Dear Judge Wall:

My law firm represents Ironshore Indemnity, Inc. ("Ironshore") against whom Intervening Defendant Continental Casualty Company ("CCC") and Defendant Transportation Insurance Company ("TIC") have served a motion to join Ironshore as a third-party defendant. I write on Ironshore's behalf in response to CCC's and TIC's February 14, 2014 Letter Brief (a copy of which my law firm received on February 27, 2014) seeking, *inter alia*, Ironshore related documents from Spector Group II, LLP ("Spector").

As Your Honor knows, this lawsuit concerns Spector's claim for coverage under the CCC and TIC general liability insurance policies. Spector seeks a declaratory judgment that underlying bodily injury and property damage claims ("the Underlying Lawsuits") relating to the collapse of a deck on a sports court being constructed on property owned by Scott and Amy Jaffee are covered under the CCC and TIC policies, and further asserts that these insurers breached their contractual obligations by failing to timely and fully acknowledge coverage thereunder. In its Letter Brief, CCC and TIC seek a copy of (1) Ironshore's professional liability insurance policy issued to Spector, (2) communications between Ironshore and Spector regarding

Spector's claim for coverage under Ironshore's policy, and (3) documents relating to the Underlying Lawsuits.

Whether or not Spector's claims are covered under the CCC and TIC general liability policies is not dependent upon anything contained in Ironshore's professional liability policy or the fact that Ironshore decided to defend Spector under that policy in the Underlying Lawsuits. CCC and TIC have made that point with unequivocal clarity. Their proposed third-party complaint against Ironshore (which has been served but not filed yet) provides nothing more than a litany of reasons why the Underlying Lawsuits are not allegedly covered under **their** policies. Their obligation to Spector -- as they themselves emphasize in that proposed pleading -- is based entirely on what is contained in their policies, not Ironshore's policy, not Ironshore's claims file and not in any other Ironshore related document. For that simple reason, Ironshore's policy is not relevant to the case, and CCC's and TIC's request for its production is not reasonably calculated to lead to the discovery of admissible evidence. In fact, all that its production would accomplish is create a distraction and delay in a case with a firm trial date less than five months away.

Furthermore, it is a well established principle of insurance contract interpretation that Ironshore's professional liability policy has no possible relevance to the interpretation of CCC's and TIC's general liability policies. Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Insurance Co.*, 472 F.3d 33, 42 (2d Cir. 2006). When interpreting a written contract, the court seeks "to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *British International Insurance Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003)(citation omitted). Simply stated, the CCC and TIC policies involve different parties and contracts.[1] For all of the foregoing reasons, CCC's and TIC's request for production of Ironshore's insurance policy must be denied.

CCC and TIC also seek copies of Ironshore's communications with Spector and documents "regarding the claims at issue." There is an important distinction between

---

[1] CCC and TIC compete with Ironshore for business in the insurance marketplace. What Ironshore chose to include in its policy is proprietary information whose disclosure to CCC and TIC would prejudice Ironshore by placing it at a competitive disadvantage. *See, e.g., Federal Open Market Committee of the Federal Reserve System v. Merrill*, 443 U.S. 340, 356 (1979)(the U.S. Supreme Court noted that "federal courts have long recognized a qualified evidentiary privilege for trade secrets and other confidential commercial information.").

communications and documents regarding the "claims" (as to which Ironshore is providing coverage and CCC/TIC are not) and communications and documents concerning the Underlying Lawsuits. Communications regarding Ironshore's decision to provide coverage under its policy has nothing to do with CCC's and TIC's decision not to do so. Ironshore's decision is based on that which is contained in its policy and CCC's/TIC's decision is based -- as their proposed third-party pleading reaffirms -- on what their policies contain. That being the case, communications between Ironshore and Spector regarding the claims at issue are as irrelevant to the case as Ironshore's policy itself.

In addition, such communications between an insurer and its insured are protected from disclosure. In a diversity action, Rule 501 of the Federal Rules of Evidence provides that state law governs the applicability of the attorney-client privilege. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 508 (S.D.N.Y. 2002). "In New York, the attorney-client privilege protects confidential communications between attorney and client relating to legal advice." *Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp.*, 2002 WL 31729693 at 3 (S.D.N.Y. Dec. 5, 2002); *see Rossi v. Blue Cross and Blue Shield of Greater New York*, 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508 (1989); New York C.P.L.R. § 4503(a).

CCC and TIC misstate the law as to the applicability of an insurer-insured privilege by suggesting that there is no privilege protecting the disclosure of communications between Ironshore and Spector or Spector's counsel. While it is true that federal courts do not recognize an insurer-insured privilege *per se*, this argument really misses the point.[2] Federal courts recognize, pursuant to New York law, the common interest doctrine as an exception to the waiver of privilege so that communications between an insured (or insured's lawyer) and the insurer does not result in a waiver of privilege where the privilege existed in the first place (e.g., attorney-client privilege and work product privilege). In this regard, the fact that an insurer is provided access to privileged communications between an insured and its attorney does not

---

[2] A communication between an insurer and its insured may not render it privileged in all instances. *Bovis Lend Lease*, 2002 WL 31729693 at 8; *Aiena v. Olsen*, 194 F.R.D. 134, 136 (S.D.N.Y. 2000)("federal courts have never recognized an insured-insurer privilege as such"). However, if a communication otherwise satisfies the elements of the attorney-client privilege, the communication by an insured with its insurer will remain privileged. Thus, where a communication (1) was for the purpose of obtaining legal advice, (2) was intended to persuade an insurance carrier to retain counsel to defend the insured, or (3) was made with the expectation that confidentiality would be maintained, it will be deemed as satisfying the applicability of the attorney-client privilege. *See Weber v. Paduano*, 2003 WL 161340 at 10 (S.D.N.Y. Jan. 22, 2003); *Bovis Lend Lease*, 2002 WL 31729693 at 5.

result in a waiver of that privilege. In such circumstances, the existence of a common interest between insurer, insured and their attorneys is one where privileged communications are preserved and not waived because of the unique contractual relationship and common interest between insured and insurer.

In *American Special Risk Insurance v. Greyhound Dial*, 1995 WL 442151 (S.D.N.Y. July 26, 1995), defendants sought discovery of an insured party's communications with its insurer related to two lawsuits that the insurer had agreed to defend. The Southern District denied the request for discovery, finding that all of the communications between the insured and the insurer were protected by the attorney-client privilege (and/or the work-product privilege), including those communications that took place prior to the insurer's agreement to defend and the communications concerning settlement contribution.

In *Kingsway Financial Services v. Pricewaterhouse-Coopers*, 2008 WL 4452134 (S.D.N.Y. Oct. 2, 2008), the Southern District focused on the timing of the communications. Although the insured and the insurer were currently adverse, the court held that prior communications between the insured and the insurer, made at a time when the insurer and the insured did share a common interest regarding the underlying action, were protected by the common interest doctrine and not subject to disclosure.[3]

By contrast, documents regarding the Underlying Lawsuits -- pleadings, discovery, correspondence among counsel involved in those cases -- are relevant, in our view, to Spector's claims for coverage under the CCC and TIC policies. What the Underlying Lawsuits involve could certainly bear upon CCC's and TIC's analysis of whether it policies cover those claims. It is that documentation, rather than communications between Ironshore and Spector regarding Ironshore's policy, that is relevant to the instant case. Thus, how and why Ironshore is handling the claims have no relevance to CCC's and TIC's own policy obligations. But what those claims proffered under the CCC and TIC policies involve and how the Underlying Lawsuits are

---

[3] In contrast, the cases cited in CCC's and TCI's letter brief involve communications and discovery which were found to not be privileged in the first instance. For example, in *Aiena v. Olsen*, 194 F.R.D. 134 (S.D.N.Y. 2000)(a case cited at page 3 of the CCC/TCI letter brief), the Southern District held that discovery sought in that case was not protected by the attorney-client privilege because the insurer had denied coverage for the claim, evidencing the lack of a common interest. In *Aiena*, plaintiffs sought discovery of communications between counsel for the defendants, i.e., the insureds, and counsel for the defendants' insurer. The *Aiena* case is inapplicable to the instant matter because, unlike *Aiena*, Ironshore has not denied coverage, and therefore its common interest with Spector remains unencumbered.

progressing are potentially relevant to CCC's and TIC's ongoing obligations to Spector, their policyholder. It is that information to which, we agree, CCC and TIC are entitled. Nothing, however, related to Ironshore falls within that category and any such Ironshore related information, for all of the foregoing reasons, should not be produced.

Respectfully submitted,

s/ Sheldon Karasik
Sheldon Karasik

Cc: All Counsel of Record (via email and ECF notice)